**David BAYLESS et al., Plaintiffs-Appellants,**

v.

**Floyd MARTINE, Dean of Students, Southwest Texas State University, et al., Defendants-Appellees.**

**No. 28865.**

United States Court of Appeals, Fifth Circuit.

June 24, 1970.

874

Mark Z. Levbarg, Brooks Holman, Austin, Tex., for appellants.

Crawford C. Martin, Atty. Gen. of Texas, James C. McCoy, W. O. Shultz, Pat Bailey, Asst. Attys. Gen., Nola White, First Asst. Atty. Gen., Alfred Walker, Executive Asst. Atty. Gen., J. C. Davis, Asst. Atty. Gen., for appellees.

Clark, Thomas, Harris, Denius & Winters, Edward Clark, Austin, Tex., for appellee, Board of Regents, State Senior Colleges.

Before THORNBERRY, DYER and CLARK, Circuit Judges.

CLARK, Circuit Judge:

As a result of participation in a Viet Nam Moratorium demonstration in November 1969, ten students of Southwest Texas State University (SWT) were suspended. The students initiated an action in the district court seeking temporary, preliminary and permanent injunctive relief prohibiting their suspension and other disciplinary measures; a

declaratory judgment that the University regulation under which they were suspended was overbroad and a prior restraint on freedom of speech and assembly; and monetary damages. The district court declined to grant the temporary restraining order or a preliminary injunction. This interlocutory appeal ensued.[1] The district court's denial of the preliminary injunction was stayed and the college was enjoined from suspending the appellants by a panel of this court, pending determination of the merits of this appeal. Bayless v. Martine, 430 F.2d 872 (5th Cir. 1969) [No. 28865, December 12, 1969]. After full briefs and argument we find that the district judge did not abuse his discretion in refusing to grant the preliminary injunction; therefore we vacate the actions previously taken by this court and remand the cause for further proceedings.

The Viet Nam Moratorium, a nationwide movement to provoke and promote demonstrations against the war in Viet Nam, held its first public protest on October 15, 1969. The SWT segment of this October event was to consist of an hour long program of short speeches. Because of the nature of the program it was felt that an auditorium would best meet the needs of the group. The college officials authorized the program to take place in the Fine Arts Auditorium from 11:00 A.M. to 12:00 Noon. Without authorization and contrary to regulations, demonstrations were held from 10:00 A.M. to 11:00 A.M. and from 12:00 Noon to 1:15 P.M. in the Huntington Statue area which is located between two classroom buildings. Both faculty and students subsequently complained that the demonstrations at these hours in the statue area disturbed and disrupted regularly scheduled classes. The Moratorium group's over-all national plan called for successive monthly demonstrations

of increasing length until the war in Viet Nam was settled. The November 13, 1969 event for which the SWT appellant-students before us today were suspended was the second of these projected moratoria.

The Students' Rights chapter of the SWT handbook, known as "Hill Hints", contained a regulation governing the holding of meetings on campus which had been adopted by The Student Rights Committee of the Student Senate. The text of the regulation follows:

"STUDENT EXPRESSION AREA

Students and University personnel may use the Student Expression Area located on the grass terraces in front of Old Main between the hours of 12:-00 noon to 1:00 p. m., and from 5:00 to 7:00 p. m. Reservations for the Student Expression Area are made through the Dean of Students Office and must be made at least 48 hours in advance.

Rules to be observed by users of the area include:

1. No interference with the free flow of traffic.

2. No interruption of the orderly conduct of University affairs.

3. No obscene materials.

4. Person making the reservation is responsible for seeing that the area is left clean and in a good state of repair.

When a registered student organization plans to invite a non-University person to address a meeting, his name must be submitted to the Dean of Students Office at least 48 hours before the event."

The area specified in the regulation is centrally located on the University campus and is surrounded by classroom buildings. This handbook also contained a detailed chapter entitled, "Student Discipline and Conduct Code."[2] The ap-

---

1. 28 U.S.C.A. § 1292(a) (1) (1966).

2. Some pertinent provisions are:
 "Sec. 101. Purpose
 (A) A student at Southwest Texas State University neither loses the

rights nor escapes the responsibilities of citizenship.
 * * * * *

"Sec. 204. Administrative Disposition of a Major Violation

pellant-students refused the administrative disposition of their cases and received the full hearing which this Code assured.

The local group sponsoring the SWT moratoria had, on a number of occasions between November 4 and November 13, discussed plans for their November activities with the college administration. The Moratorium group insisted that they again wanted to hold a demonstration at the Huntington Statue area of the campus. The group further adhered to their requirement that the demonstration must take place from 10:00 A.M. until 2:00 P.M. Thus both the place and the time demanded by the Moratorium group were outside of the Hill Hints regulation quoted above.

University personnel endeavored to secure an auditorium so that the demonstration could be held inside but no auditorium was available. The college officials also offered to permit the demonstration to be held at the statue area if it was limited to the hour between 12:00 Noon and 1:00 P.M. Classes were scheduled to be and were in progress on this particular day in the classroom buildings which adjoined the statue area. No attempt was made to show that the student expression area defined in the regulations was not available to the group during the hours provided for therein. With explicit knowledge that they were acting contrary to the University's general regulation and the particular directions of the University officials who worked with them, the second Moratorium demonstration began at the statue area at approximately 9:45 A.M. on November 13. An estimated fifty demonstrators congregated in the area at the outset, but after Appellee Martine, Dean of Students of SWT, arrived and told the demonstrators to leave only ten refused and remained. They are the appellants here. There is no conflict in the evidence nor is any issue raised concerning the demonstrators' conduct. They sat upon the grass. They intended to be and were silent until the time of their suspensions. They had caused no injury to property themselves. They had attracted a crowd of on-lookers.

Despite the initial orderliness of the November demonstration, the officials of SWT testified that based upon their October experience they did not believe that they could preserve order if the demonstration were allowed to continue during the four hours planned in the middle of the academic day at this place on the campus. Some class disruptions had in fact already begun to occur at the time Dean Martine acted. The demonstrating group had been warned in advance that violation of regulations would result in disciplinary action. After the demonstration actually started Dean Martine specifically warned the students that if they continued to violate the University's regulations they would be suspended until the Fall 1970 term. He then gave them a reasonable opportunity to desist. Only those who would not leave the prohibited demonstration site were suspended. The suspensions began on November 13, 1969

* * * * *

"(B) A student may refuse administrative disposition of his alleged major violation and on refusal is entitled to a hearing under Chapter 300. If a student accepts administrative disposition, he shall sign a statement that he understands the violation charges, his right to but waiver of a hearing, the penalty imposed. and his waiver of the right to appeal.

(C) In administratively disposing of a major violation, the Dean of Men and/or Dean of Women may impose

any disciplinary action authorized under Section 601(A) 9, 10, or 11.

* * * * *

"Sec. 601. Authorized Disciplinary Penalties

(A) The Dean of Men and/or Women, under Sections 203 and 204, or the Student Personnel Discipline Committee, under Section 304, or the Faculty-Student Board of Review, under Section 403, may impose one or more of the following penalties for violation of a Regents' rule, University regulation, or administrative rule:

* * * * *

"(10) suspension from the University"

and were interdicted by this Court's interim injunctive order.

Plaintiffs have not attacked the procedures by which they were disciplined under the rules laid down in Dixon v. Alabama State Board of Education, 294 F.2d 150 (5th Cir. 1961). The sole object of their attack before the court below and on this appeal is the validity of Hill Hints regulation quoted above.

 The broad standard applicable to appellate review of a district court's denial of preliminary injunctive relief is measured by a strict test which disregards whether this court would have exercised its discretion to deny the injunction and looks only to determine whether the district judge clearly abused *his* discretion in acting as he did. Allen v. Mississippi Commission of Law Enforcement, 424 F.2d 285 (5th Cir. 1970); Ferrell v. Dallas Independent School District, 392 F.2d 697 (5th Cir. 1968); Blackwell v. Issaquena County Board of Education, 363 F.2d 749 (5th Cir. 1966); Detroit Football Company v. Robinson, 283 F.2d 657 (5th Cir. 1960); 7 Moore's Federal Practice ¶ 65.04 [1] & [2] (2d ed. 1966). In testing this discretion we must take into account the status of each of the parties, the respective effects which the denial or grant of the injunctive relief requested would have on these parties and upon any broader interests which might be affected—particularly public interests, the proof offered in support of and against the grant of such relief and the correct legal standards to be applied. All of these factors play a part in what is basically a balancing of the conveniences of the parties and the possible injuries to them according as they may be affected by the granting or withholding of the injunction. Yakus v. United States, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834 (1944). Some circuits have aptly expressed the equation as "a flexible interplay between the likelihood of irreparable harm to the movant and the court's belief that there is a 'reasonable certainty' (or probability) that the movant will succeed on the merits at a final hearing." Packard Instrument Company v. ANS, Inc., 416 F.2d 943, 945 (2nd Cir. 1969); Checker Motors Corporation v. Chrysler Corporation, 405 F.2d 319 (2nd Cir. 1969); Crowther v. Seaborg, 415 F.2d 437 (10th Cir. 1969).

The order denying the preliminary injunction in the case sub judice stated in part: "There is 'a gravely serious question that the plaintiffs could prevail on the merits as reflected by the record in this hearing." Thus the district judge was, as we are, not convinced after the preliminary hearing that the plaintiffs had made a prima facie case showing that the Hill Hints regulation was unconstitutional on its face or in its application to them, thus they had not demonstrated that their ultimate right to the relief sought was reasonably probable.

 There is no showing that the University Administration in any way attempted to sidetrack the demonstration because of its subject matter. In argument before the court counsel for appellants admitted that the college had shown no animus toward the demonstrators or their cause. The October 15th demonstration had taken place without disciplinary action by the college—even though it was in violation of the above regulation and caused academic disturbance. The administration attempted to work out an agreeable time and place for the November demonstration which would permit it to be effective and at the same time have a minimal impact upon the essential educational functions of SWT. These facts when linked with the expectation that the demonstration was to be only one in a series of recurrent, increscent events impels the conclusion that the University officials acted reasonably to balance the interests of the majority of students in the maintenance of an academic atmosphere conducive to the pursuit of their chosen studies against the unquestioned rights of those who wished to demonstrate their views against the war in Viet Nam. Cf. Bachellar v. Maryland, 397 U.S. 564, 90 S.Ct. 1312, 25 L.Ed.2d 570 (1970).

Appellants contend that the Hill Hints regulation on its face amounts to an impermissible prior restraint upon the exercise of First Admendment rights. It cannot be read so broadly. The requirement of reserving the Student Expression Area 48 hours in advance is a reasonable method by which the problem of simultaneous and competing demonstrations could be avoided. While a university could be required under appropriate circumstances to permit both the Students for a Democratic Society and the Young Americans for Freedom to demonstrate, no one could reasonably contend that the Constitution required the college to permit such demonstrations to take place at the same time and in the same area. Another alternative is that advance notice may reasonably be required so as to permit the college to provide police protection for both the demonstrators and University property.

■ The Student Expression Area regulation in Hill Hints is a valid exercise of the University's right to adopt and enforce reasonable, non-discriminatory regulations as to the time, place and manner of student expressions and demonstrations. Tinker v. Des Moines Independent Community School Dist., 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969); Burnside v. Byars, 363 F.2d 744 (5th Cir. 1966); Blackwell v. Issaquena County Bd. of Educ., 363 F.2d 749 (5th Cir. 1966); see also C. A. Wright, The Constitution on the Campus, 22 Vand.L.Rev. 1027 (1969).

These students certainly have no standing to complain that the 48-hour notice period as applied adversely affected them. They were dealing with the University officials concerning a continuing series of demonstrations and had the subject November demonstration under actual consideration and discussion with University officials for nine days.

We think appellants underscore rather than undermine the reasonableness and constitutionality of the regulation by pointing out that it is permissive and that the University had no codified prohibition which would make the statue

area (or any other campus areas) unavailable for student demonstrations. When this is coupled with the administration's prior and present efforts to allow these very students maximum freedom of expression consistent with its duty to operate the college as an educational institution, we think it underscores the validity of having a regulatory minimum. A regulation governing conduct on a university campus is not a criminal law. It also bears noting that the minimum was set by the students themselves through their peers acting in the Student Senate.

The students now before us are mistaken in characterizing the admirable degree of flexibility displayed by the college administration in offering additional places and times to those specified in the Hill Hints regulation in a futile attempt to meet their demands, as some form of ad hoc action. The University's compliance stands in stark contrast with their intemperate insistence that they would hold their activities when and where they pleased despite the regulation and particular directions to the contrary. Since the prescribed minimum was sufficient, the administration's willingness to go the extra mile was clearly a virtue not a fault.

■ Appellants place great reliance upon the fact that the demonstration was silent and did not disrupt classes. There is evidence to the contrary. In any event we do not regard the nature of the demonstration as significant in the instant case for in this case, unlike Tinker, Burnside and Blackwell these students violated a general standing campus regulation valid on its face. In Tinker, Burnside and Blackwell special ad hoc regulations were involved which were advised to specifically restrict the wearing of the arm bands or buttons there involved. In those cases the Supreme Court and this Court held it was significant that the proscribed conduct either was (Blackwell) or was not (Tinker and Burnside) causing and contributing to a disruption in the normal activities of the schools involved.

Obviously, the test for determining the validity of an ad hoc regulation would be stricter than the test for a general one, which does not carry the inherent possibility that it might be directed against the views espoused under the pretext of preserving campus order. The campus handbook was promulgated and published before the first Moratorium demonstration was held. On its face it is applicable to all sorts of expressions by students, from the proverbial demonstrations against food in the school cafeteria. Saturday classes, or the war in Viet Nam. Certainly the right to express one's views freely concerning the quality of cafeteria food is to be held no less sacred under the First Amendment than the right of free expression of one's views about war. When a general regulation such as that contained in Hill Hints had been made explicitly applicable to the students here involved and they had been fully apprised of the penalty to be meted out for violation of the regulation not only by the Dean's direct statements to them but by the express provisions of the Student Discipline and Conduct Code, which was printed and distributed as a part of the Hill Hints handbook, then the University's right to discipline an erring student is not contingent upon the extent of disruption caused by his direct disobedience of the regulation. A speeding motorist may not escape penalty on the grounds that his speeding has not caused damage to person or property. Since these students demonstrated no more than that they were suspended for violating a valid regulation, the absence of damage is equally irrelevant.[3]

On this interlocutory appeal from the refusal of the district court to grant a preliminary injunction, we hold only that the district court did not abuse its discretion. Our application of principles in the foregoing discussion is limited to the pleadings and the record facts now before us. When this case is ultimately fully developed on its merits, facts may appear which require a different application of law or raise different equities. Therefore, we intimate no view as to what the ultimate outcome of the case should be.

■ Since appellants failed to make out a prima facie case demonstrating a reasonable probability of success on the merits a fortiori they did not make that even stronger showing that is prerequisite to the grant of a stay and the issuance of an injunction pending a hearing on the merits of an interlocutory appeal. *See* Pitcher v. Laird, 415 F.2d 743 (5th Cir. 1969); and Belcher v. Birmingham Trust Nat. Bank, 395 F.2d 685 (5th Cir. 1968). Therefore, this Court's prior stay and injunction order of December 12, 1969 in this cause must now be vacated.[4]

---

3. Judge Thornberry's concurrence indicates the need for a brief additional explication of the basis of the University's action. The student-appellants could have been disciplined for failure to abide by the University administrators' grant of permission to use the Huntington Statue area at a different hour, but the record shows that this and all other alternative means of demonstrating their protest of the war in Viet Nam were flatly rejected by these students. When Dean Martine confronted the demonstrating students his warning to disburse or face suspension and other penalties adverted only to their violation of student handbook regulations and not to breach of the more relaxed permissions offered by the Dean and other officials. The charge against them at the academic disciplinary hearing was based upon their failure to comply with the Hill Hints "Student Expression Area" provisions set out above. The complaint in the district court focused squarely upon the application of this handbook provision to the students and attacked its validity. This was the case made, it was the case tried and must, in our opinion, be the subject of this review.

4. Appellants made no showing that they had applied to the district court for a stay or injunction pending appeal, pursuant to Rule 8, F.R.A.P. While such a failure is not a jurisdictional defect [See Cumberland Tel. & Tel. Co. v. Public Service Comm., 260 U.S. 212, 43 S.Ct. 75, 67 L.Ed. 217 (1922)], we do not believe it should have been bypassed in the

■ One further point remains. During the pendency of this interlocutory appeal appellants moved this court for further relief to broaden the injunction heretofore granted so as to order SWT to record and transcribe appellants' grades for the Fall semester 1969–70. We assume that this motion would also cover the Spring semester of this term, which has commenced while the appeal has been pending. This presents a complicated question of law and equity which this court is not prepared to deal with on the basis of the limited record before it. The injunction granted pending the hearing of this appeal on its merits now proves to have been improvidently granted. An injunction to which a party is not entitled can confer no rights upon him. Cf. Hyde Construction Company, Inc. v. Koehring Company, 388 F.2d 501 (10th Cir. 1968), cert. den. 391 U.S. 905, 88 S.Ct. 1654, 20 L.Ed.2d 419 (1968). Thus the appellants have attended SWT at the peril of predicting the ultimate outcome of this appeal. Their rights to grades, the college's right to retain any tuition payments made, the ability of the college to impose equivalent suspensions in future years (we are advised some of the students are seniors and may have completed their college courses by the time this case is remanded) are some of the factors which readily come to mind that may play a part in the ultimate resolution of the respective rights of the parties. It may be that the college administration would now think it best to substitute some other form of discipline. It may also be that the district court will feel it more appropriate to withhold any action until the case has been finalized on its merits. At least it is clear that on the record before us now we should not attempt to resolve the issue. In the interest of justice, Appellants' motion for further relief is remanded with the cause to the district court.

Interim stay and injunction pending appeal vacated. Affirmed and remanded for further proceedings.

THORNBERRY, Circuit Judge (concurring):

I concur in the result reached by the Court today, but for a different reason from that put forth by the majority. In my opinion, the conduct of these demonstrators could not be considered a violation of the student expression area rule set out at page 70 of the University publication "Hill Hints," because that rule merely specifies a time and place at which student demonstrations *may* be held but does not prohibit demonstrations at any other time and place.[1] If the rule can be construed so as to apply in a prohibitive manner to these circumstances, then I think its validity doubt-

---

case at bar. It does not follow from the refusal to grant a preliminary injunction pending a trial in the court below that the district court would refuse injunctive relief pending an appeal.

1. The rule relied upon by the majority states that "Students and University personnel may use the Student Expression Area located on the grass terraces in front of Old Main between the hours of 12:00 noon to 1:00 p. m., and from 5:00 to 7:00 p. m." Thus the rule is permissive only. The evidence indicates that the administration has always interpreted it as permissive and has regarded all other parts of the campus and all other times as subject to some degree of discretion for the protection of University functions.

The majority relies upon the rule to distinguish the case of Tinker v. Des Moines Independent School District, 1969, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731. The rule is thus an essential step in the reasoning of the majority, because it allows the avoidance of the question whether there was a danger of "material and substantial disruption" of University functions. I question the propriety of distinguishing *Tinker* by stretching a rule that does not seem to me to cover the case. To my mind, *Tinker* is inapplicable anyway because it involved a substantial impairment of the plaintiffs' expression of ideas, and no such impairment is occasioned in this case because the University furnished adequate alternative forums.

ful.[2] At the same time, I find it unnecessary to rely upon the rule to hold the suspensions valid. I find from a study of the record that Dean Martine's directions to the students were reasonable and lawful. Regulations issued ad hoc to particular students concerning their expression of ideas must meet a higher standard than codified rules, but I find that the dean's action in this case met the standard. The dean's directions did not prohibit the students from holding their demonstration, but merely regulated the time and place at which that demonstration could be held. My concurrence is therefore based upon my judgment that the demonstrators knowingly and intentionally violated a lawful direction of the Dean of Students that prohibited them from using this particular time and place for their demonstration, after being specifically warned by the dean that they would be suspended if they persisted in this particular course of action.

The students were suspended because of their failure to obey the dean's suggestion that they occupy the very area they occupied, but at a different time. Had they used the statue area from noon to one o'clock, the time that the dean suggested, rather than insisting upon occupying it from ten o'clock on, a time that the dean specifically prohibited, they would not have been suspended. This suggestion shows a real effort to ac-commodate the wishes of the demonstrators. And the efforts of the administration to protect the rights of the demonstrators were even more extensive than this. These efforts were reflected in numerous communications between the dean and the demonstrators before the date of the demonstration, in which several alternatives were explored and suggested by the administration but rejected by the demonstrators. The time and place set out in the student expression area rule was always available to the students; the dean alternatively proposed a way in which they could lawfully use the very place they used; and the administration advanced other possibilities, including the use of an auditorium at times when space was available. It appears from the evidence that the University would have been amenable to reasonable suggestions from the students themselves as to when and where they could hold their demonstration, so long as it could be accommodated to the University's activities. Thus the record shows a good-faith attempt by the administration of the University to set up a time and place that would allow the demonstrators their first-amendment rights while at the same time preventing the demonstration from interfering with the functions of the University.

The crucial fact in this case is that the University did not prohibit this demon-

2. In my judgment, the only way in which the rule can be interpreted so as to avoid the discretionary nature of the University's action in this case is to say that it prohibited demonstrations at all other times and at all other places than those specified in the rule. This interpretation might make the rule invalid for several reasons. First, it requires a real stretch of the imagination to infer this meaning from the language of the rule. Second, the rule was not so construed when applied to other student assemblies, and it would be discriminatory so to construe it in this case. Third, it would restrict student assemblies to so small an area and so brief a time as to be unreasonable if strictly enforced.

By tacitly allowing loose construction of the regulation on the ground that it is a university rule governing student conduct, the Court proceeds upon as-sumption and without discussion into a difficult new area of the law. The courts that have held that such rules are not subject to the usual standards of specificity required of laws regulating conduct off the campus have been severely criticized by the commentators. *Compare* General Order on Judicial Standards of Procedure and Substance in Review of Student Discipline in Tax Supported Institutions of Higher Education, 45 F.R.D. 133, 146 (W.D.Mo.1968) with Wright, The Constitution on the Campus, 22 Vand.L.Rev. 1027 (1969) Even if this view should prevail, rules concerning first amendment rights on campus should probably be subject to a stricter construction. At any rate, the rule in this case need not be examined by the Court, because there was no denial of first-amendment rights by the reasonable directions issued by the dean.

stration. It merely regulated the time and place at which it could be held. At this time, it requires no citation to say that the University was authorized to regulate the time, place and manner of conduct on the campus provided its regulations were reasonable. A University is a dynamic, active institution that consists of large numbers of people crowded in a small space, so that it can function only if those people obey rules regulating the time, place and manner of their activities. The administration, in its turn, is required to make every reasonable effort to accommodate the freedom of expression of all students with the functions of the University, but this effort must be made under constantly changing conditions and in response to changing interests. Perfect congruence with the intentions of all students cannot be expected. Even a carefully drafted set of rules, although it can go far toward reducing conflicts, cannot solve all the University's problems. Therefore, so long as the administration protects freedom of expression without substantial impairment, it must be afforded the flexibility to issue ad hoc directions specifying the time, place and manner in which particular activities are to be held and the right to expect that these directions will be followed. The administration may even be justified in issuing a regulation that impairs some expression if that regulation is absolutely necessary to prevent material and substantial disruption of its lawful functions,[3] and consequently when it has actually protected the right to expression by furnishing adequate alternative forums, as the University did in this case, its actions are lawful.

For these reasons, it seems to me that the trial court correctly held that the plaintiffs had not shown a sufficient probability of prevailing on the merits to qualify them for a preliminary injunction under the circumstances.

3. *See* Tinker v. Des Moines Independent Community School District, 1969, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731; Burnside v. Byars, 5th Cir. 1966, 363 F.2d 744; Blackwell v. Issaquena County Board of Education, 5th Cir. 1966, 363 F.2d 749.