Robert W. EVANS et al., Plaintiffs,

v.

STATE BOARD OF AGRICULTURE
et al., Defendants.

Civ. A. No. C-2206.

United States District Court,
D. Colorado.

May 4, 1971.

Forrest C. O'Dell, Sheldon E. Friedman, Denver, Colo., for plaintiffs.

John H. Bush, Asst. Atty. Gen., Fort Collins, Colo., for defendants.

## MEMORANDUM OPINION

WINNER, District Judge.

Plaintiffs are students at Colorado State University. Defendants are the governing board and officials of that tax supported school. The gravamen of the amended complaint is that a policy statement adopted by the president of the University and ordered placed on file by its governing board, the State Board of Agriculture, is violative of plaintiffs' first amendment rights.

On March 24, 1969, the State Board of Agriculture adopted the following regulation:

"PEACEFUL ASSEMBLY:

"Colorado State University acknowledges the rights and privileges of individuals or groups to gather on public property for the purpose of peaceful assembly. The University expects the rights and privileges of all persons to be respected at such gatherings.

"The University requires that persons engaged in such assemblies on campus will conduct themselves in a manner that will not impair the health or safety of any individual, disrupt the normal conduct of University affairs, or damage and destroy property.

"Persons planning or initiating such assemblies to be conducted on the Colorado State University campus are re-

quested to identify their group in advance to the appropriate University personnel through the Office of the Dean of Students and state the purpose of such assemblies. Arrangements for any assembly which involves the use of University buildings not available for general use must be made with the appropriate person. The organization sponsoring a speaker, or conducting an assembly, assumes the responsibility for maintaining the University policies on peaceful assembly and student freedom of expression. Staff assistance is available in the planning of such event in ways to eliminate or minimize the possibility of disruption. University police can be requested to assure the rights of all concerned are protected.

"Peaceful assembly is defined as any purposeful gathering on campus, in or outside of a University building or facility, by one or more persons whose conduct is peaceful and conducts himself in accordance with the University rules and practice and law. Peaceful assembly includes meetings, speeches, debates, demonstrations, marches, vigils, sit-ins, rallies, protests, and similar meetings or gatherings that do not threaten or violate policies and rules, interfere with the conduct of University business, regularly scheduled events, infringe on the rights of others, endanger their health and safety, or damage or destroy property.

"Any act by student demonstrators which interferes with the rights of others, disrupts or impairs the normal functioning of the University, damages or destroys property, or impairs health or safety is grounds for suspension or dismissal from the University.

"Demonstrations are prohibited in classrooms during hours they are scheduled for use, or at any locality when conducted in a manner which interferes with educational functions. Demonstrations are further prohibited in any special use facility. Demonstrators refusing to vacate such premises when directed by the instructor in charge or by authorized staff are subject to immediate temporary suspension, and arrest under applicable city and state laws."

Plaintiffs claim no constitutional infirmity as to this regulation. Instead, they concentrate their fire on the policy statement promulgated by the University President on February 6, 1970, and ordered placed on file by the Board on March 28, 1970. That policy statement reads:

"The use of a university facility or a portion thereof for an authorized scheduled athletic event is limited to activities related solely to the scheduled event for the period set aside for such event.

"It follows therefore that any demonstration or protest carried on within the facility or portion thereof set aside for such scheduled use for the period of assigned use shall be considered to be contrary to the university's 'Peaceful Assembly' policy.

"Further, any act of a person or persons which interferes with, impairs or limits the carrying on of any authorized activity related to a scheduled athletic event or interferes with the audience's ability to view or participate in the event or endangers their health or safety will be considered violative of such policy.

"Lastly, the carrying, holding or displaying of any sign, banner, or poster or the posting of a sign, poster or banner on any portion of the premises during the assigned period of the athletic event shall be considered contrary to and incompatible with the cited policy."

Tinker v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731, commands that the factual background of school policies and regulations be investigated in passing upon the question of their alleged infringement of first amendment rights; and, during oral argument, A.C. L.U. counsel for plaintiffs conceded that the validity or invalidity of any regulation or policy is largely a question of fact

to be determined in light of all of the surrounding circumstances.

Briefly, the factual background is this: Some people think that as a part of its fundamental concepts, the Mormon religion discriminates against blacks [a belief vigorously denied by members of that faith] and disruptive demonstrations have been conducted at many athletic events in which teams from the Mormon sponsored school, Brigham Young University, have competed. A Western Athletic Conference basketball game between Colorado State University and Brigham Young University was scheduled for February 5, 1970, in Moby Gymnasium on the C.S.U. Campus at Fort Collins, Colorado. In accordance with the unchallenged University regulation of March 24, 1969, permission was granted to a student group to conduct a peaceful demonstration outside the gymnasium where the game was to be played. This demonstration was carried out in a peaceful and orderly fashion.

The record is silent as to whether application was made to hold a demonstration within the gymnasium, but based on statements of counsel during argument and on the circumstances shown by the evidence, it is reasonable to infer that permission for such a demonstration was requested and refused. However, whether such application was or was not made is not important to the decision of this case, because the policy statement under present attack was not in effect on the night of the game.

During the game's halftime intermission, pom pom girls from Brigham Young University were performing on the basketball floor when a group of persons (largely students) invaded the basketball court carrying signs of protest against the claimed discriminatory practices of the Mormon Church and Brigham Young University. This group marched the length of the floor and disrupted the girls' performance. Campus police and City of Fort Collins police were called, and they attempted to control the melee. A fight broke out between an employee who was trying to wipe down the basketball floor and several of the demonstrators, and this fight was stopped by the police only with substantial difficulty. A flaming missile was thrown from the stands onto the floor. Someone either threw or wielded a lethal piece of steel angle iron which struck a press photographer in the head. That he is alive today is little short of a miracle. According to the testimony, tempers of many of the spectators (including the tempers of the overwhelming majority of the students in attendance) became short, and the rage of the crowd at the unauthorized interruption of the halftime activities and delay of play of the second half became dangerously apparent. The situation was tense, and panic or a riot was more than a mere possibility. Fortunately, the police were able to cajole the demonstrators into leaving the floor before serious injury occurred. All of this is shown by the testimony and by photographs and movies of the incident which are part of the record in this case. It would be unfair to fail to comment upon the remarkable tact, restraint and professional skill exhibited by the police in their handling of an explosive situation which was pregnant with possibility of development into a Kent State tragedy. The police handled a group of hooligans without injuring any of them and without serious injury to anyone else. The Court agrees with the testimony of the witness Tietz, the University Vice-president for Student and University Relations that the University was lucky to fare as well as it did that desperate night; but, in addition to thanking its lucky stars, the University owes a debt of gratitude to its campus police and to the police of the City of Fort Collins for their outstanding professionally competent job in handling an unruly crowd.

In this tense atmosphere, the policy statement under present attack was drafted and announced the next day, and the testimony shows that some students eagerly awaited a chance to challenge it. A few weeks later, when the wrestling meet between C.S.U. and B.Y.U. was held, University permission was granted

a group of students, of which plaintiffs were a part, to demonstrate outside the gymnasium, but permission to demonstrate inside the building was denied. Plaintiff Evans testified that permission to demonstrate within the gymnasium was requested because his group was anxious to manufacture an opportunity to engage in civil disobedience. No civil disobedience appears to have followed the University's refusal of permission to demonstrate, but, predictably, this lawsuit did.

Much has been written as to the extent of constitutionally permissive university control over students and their activities. We start with Buttny v. Smiley, (D.C. Colo.) (1968) 281 F.Supp. 280, where Chief Judge Arraj forecast with precision many of the results in *Tinker*, decided later that same year. In *Buttny*, it is said:

> "We agree with the students that the doctrine of 'In Loco Parentis' is no longer tenable in a university community; and we believe that there is a trend to reject the authority of university officials to regulate 'off-campus' activity of students. However, that is not to say that conduct disruptive of good order on the campus should not properly lead to disciplinary action.

> "We do not subscribe to the notion that a citizen surrenders his civil rights upon enrollment as a student in a university. (citations omitted) As a corollary to this, enrollment does not give him a right to immunity nor special consideration, and certainly it does not give him the right to violate the constitutional rights of others."

Some nine months after the decision in *Buttny*, the Supreme Court handed down Tinker v. Des Moines Independent Community School District, (1968) 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731. There school officials "adopted a policy that any student wearing an armband (to protest the Vietnam war) would be asked to remove it, and if he refused he would be suspended until he returned without the armband." The Court struck down

that announced policy as a violation of the students' first amendment rights. In so holding, it was said:

> "In order for the State in the person of school officials to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint. Certainly where there is no finding and no showing that engaging in the forbidden conduct would 'materially and substantially interfere with the requirements of appropriate discipline in the operation of the school,' the prohibition cannot be sustained.

> "In the present case, the district court made no such finding, and our independent examination of the record fails to yield evidence that the school authorities had reason to anticipate that the wearing of the armbands would substantially interfere with the work of the school or impinge upon the rights of other students. * * *

> "It is also relevant that the school authorities did not purport to prohibit the wearing of all symbols of political or controversial significance. The record shows that students in some of the schools wore buttons relating to national political campaigns, and some even wore the Iron Cross, traditionally a symbol of Nazism. The order prohibiting the wearing of armbands did not extend to these. Instead, a particular symbol—black armbands worn to exhibit opposition to this Nation's involvement in Vietnam—was singled out for prohibition. Clearly, the prohibition of expression of one particular opinion, at least, without evidence that it is necessary to avoid material and substantial interference with school work or discipline, is not constitutionally permissible.

> * * * * * *

> " * * * conduct by the student, in class or out of it, which for any reason —whether it stems from time, place, or type of behavior—materially dis-

rupts classwork or involves substantial disorder or invasion of the rights of others is, of course, not immunized by the constitutional guarantee of freedom of speech. * * *.

"As we have discussed, the record does not demonstrate any facts which might reasonably have led school authorities to forecast substantial disruption of or material interference with school activities, and no disturbances or disorders on the school premises in fact occurred."

█ It is to be noted that the policy of Colorado State University is not limited to a prohibition against demonstrations or signs concerning just one school of thought. The policy is aimed at all demonstrations and all signs displayed at previously scheduled activities "carried on within the facility or portion thereof set aside for such scheduled use for the period of the assigned use."

Although not spelled out in the issues framed by the pleadings and the pretrial order, plaintiffs make some sort of an argument that the University has not been consistent in its enforcement of the policy; and, therefore, say plaintiffs, for some reason the policy itself is constitutionally invalid. The facts supporting that argument are these:

(a) At a football game, the student card section flashed a sign, "Free Claude Fry," a former professor at Colorado State University then held prisoner by South American rebels.

(b) During the halftime ceremonies at another football game, the entire football team and university officials participated in a memorial service for an outstanding black athlete who had met a tragic death in an automobile accident.

The Court is simply unable either to follow or accept plaintiffs' arguments that these two incidents have anything to do with the constitutional questions raised by the pleadings and included within the pretrial order.

In Esteban v. Central Missouri State College, (1969) (8 Cir.) 415 F.2d 1077, then Judge, now Justice Blackmun, speaking for a divided court, held that disciplinary action by college officials against students who participated in a demonstration were proper. It was held:

"We agree with those courts which have held that a school has inherent authority to maintain order and to discipline students (citations omitted). We further agree that a school has latitude and discretion in its formulation of rules and regulations and of general standards of conduct. (citations omitted)

"We regard as quite distinguishable cases such as Hammond v. South Carolina State College, 272 F.Supp. 947 (D.S.C.1967) * * *.

"College attendance, whether it be a right or a privilege, very definitely entails responsibility. This is fundamental. It rests upon the fact that the student is approaching maturity. His elementary and secondary education is behind him. He already knows, or should know, the basics of decent conduct, of nonviolence, and of respect for the rights of others. He already knows, or should know, that destruction of property, threats to others, frightening passersby, and intrusions upon their rights of travel are unacceptable, if not illegal, and are not worthy of one who would pursue knowledge at the college level. These plaintiffs are no longer children.

*    *    *    *    *    *

"Let there be no misunderstanding as to our precise holding. We do not hold that any college regulation, however loosely framed, is necessarily valid. We do not hold that a school has the authority to require a student to discard any constitutional right when he matriculates. We do hold that a college has the inherent power to promulgate rules and regulations; that it has the inherent power properly to discipline; that it has power appropriately to protect itself and its prop-

erty; that it may expect that its students adhere to generally accepted standards of conduct; that, as to these, flexibility and elbow room are to be preferred over specificity; that procedural due process must be afforded \* \* \* by way of adequate notice, definite charge, and a hearing with opportunity to present ones own side of the case and with all necessary protective measures; that school regulations are not to be measured by the standards which prevail for the criminal law and for criminal procedures; and that the courts should interfere only where there is a clear case of constitutional infringement.

"After all, the test, we feel, is that of reasonableness. (citation omitted) On that standard we perceive here no denial of constitutional rights of Esteban or of Roberds."

Guzick v. Drebus, (1970) (6 Cir.) 431 F.2d 594, involved an attack on a school rule prohibiting the wearing of any button or badge bearing a slogan. In upholding the school's rule, the Court distinguished *Tinker* on the ground that the prohibition in *Tinker* was directed only to armbands in opposition to the Vietnam war, and it was said:

"Further distinguishing *Tinker* from our case are their respective settings. No potential racial collisions were background to *Tinker*, whereas here the changing racial composition of Shaw High from all white to 70% black, made the no symbol rule of even greater good than had characterized its original adoption. In our view, school authorities should not be faulted for adhering to a relatively nonoppressive rule that will indeed serve our ultimate goal of meaningful integration of our public schools. \* \* \*

" \* \* \* In the case at bar, the District Judge, upon a valid appraisal of the evidence, did find that 'if all buttons are permitted or if any buttons are permitted, a serious discipline problem will result, racial tensions will be exacerbated, and the educa-

tional process will be significantly and substantially disrupted.'
"Here, the District Court, conscious of the commands of *Tinker*, said,

'Furthermore, there is in the present case *much more than an "undifferentiated fear or apprehension"* of disturbances likely to result from the wearing of buttons at Shaw High School.'

"The District Judge was of the view that the situation at Shaw was 'incendiary.' The evidence justified such a view. \* \* \*

"The District Judge here points out that for school authorities to allow some buttons and not others would create an unbearable burden of selection and enforcement. He said:

'In addition, any rule which attempts to permit the wearing of some buttons, but not others, would be virtually impossible to administer. It would involve school officials in a continuous search of the halls for students wearing the prohibited type of buttons. It would occasion ad hoc and inconsistent application. It would make the determination of permissible versus impermissible buttons difficult, if not impossible. It would make it difficult for the school officials to give both the substance and appearance of fairness, and would deprive the school officials of their present position of neutrality.'

\*  \*  \*  \*  \*  \*

"All courts and constitutional writers have emphasized the need for proper balancing in the exercise of the guarantees of the Constitution. In *Burnside* [Burnside v. Byars] (5 Cir.) 363 F.2d 744, the Fifth Circuit observed:

'The interest of the state in maintaining an educational system is a compelling one, giving rise to a *balancing of First Amendment rights* with the duty of the state to further and protect the public school system.' "

Bayless v. Martine (1970) (5 Cir.) 430 F.2d 873, upheld regulations of Southwest Texas State University which limited demonstrations to the "Student Expression Area" during certain hours. The students asked a relaxation of the rule to permit a demonstration in the auditorium, and college officials attempted to, but were unable to provide those facilities because of prior commitments. The students then demonstrated anyway outside the "Student Expression Area." In upholding the disciplinary action taken against those students, it was said:

"The Student Expression Area regulation in Hill Hints is a valid exercise of the University's right to adopt and enforce reasonable, non-discriminatory regulations as to the time, place and manner of student expressions and demonstrations. * * *

"We think appellants underscore rather than undermine the reasonableness and constitutionality of the regulation by pointing out that it is permissive and that the University had no codified prohibition which would make the statute area (or any other campus areas) unavailable for student demonstrations. When this is coupled with the administration's prior and present efforts to allow these very students maximum freedom of expression consistent with its duty to operate the college as an educational institution, we think it underscores the validity of having a regulatory minimum. A regulation governing conduct on a university campus is not a criminal law.

* * *

"The students now before us are mistaken in characterizing the admirable degree of flexibility displayed by the college administration in offering additional places and times to those specified in the Hill Hints regulation in a futile attempt to meet their demands, as some form of ad hoc action. The University's compliance stands in stark contrast with their intemperate insistence that they would hold their activities when and where they pleased despite the regulation and particular

directions to the contrary. Since the prescribed minimum was sufficient, the administration's willingness to go the extra mile was clearly a virtue not a fault."

These last comments in *Bayless* are peculiarly apropos here when one remembers the dedication of plaintiff Evans to participate in civil disobedience and the tenuous arguments of plaintiffs that the University should be censured for not taking action against those responsible for the humanitarian display asking freedom for Dr. Fly and against the Athletic Department for honoring a deceased football player in a halftime memorial service.

The Court finds that as of February 6, 1970, the officials of Colorado State University were faced with an extremely incendiary situation which was likely to burst into flame in a way which could and probably would have caused personal injury or death to innocent persons and which could and probably would have caused extensive property damage unless immediate steps were taken to bring the situation under control. Students had rowdily disrupted a regularly scheduled athletic event and had endangered the safety of and had interfered with the personal freedom and rights of several thousand spectators at the game. That no one was seriously injured during that demonstration is almost unbelievable.

This is not a *Tinker* situation where officials had mere apprehension of trouble. Colorado State University officials were in trouble—bad trouble. Something had to be done, and it had to be done in a hurry. The policy was adopted the next day; and, although with months' to reflect, the language of the policy statement might be improved upon, it is interesting to note that at time of oral argument, counsel for plaintiffs was unable to suggest any limitation of language which might add strength to its constitutionality. At first blush, it might appear that the University should have used more specificity in its policy statement as to the type of demonstrations which were to be prohibited. But, had it

done so, it probably would have run afoul of the criticisms expressed in *Tinker,* and broadness of policy as commended in *Guzick.* Moreover, had the University attempted to adopt a more detailed statement of policy, the Court recognizes the ingenuity of students' minds, and undoubtedly the school officials would have been confronted with one borderline problem of interpretation after another.

■ It has been repeatedly held, and it is worthy of repetition, that school regulations and policy statements need not meet all of the standards of certainty required of criminal statutes. They must be reasonable. They must be understandable. Colorado State University's policy statement is understandable, and, under the facts and circumstances here present, the policy is manifestly reasonable.

To view the movies of the events of February 5, 1970, in Moby Gymnasium leaves one in doubt as to whether the students' conduct of that night [and it should be emphasized that these comments apply to a tiny minority of the students in attendance] should be characterized as juvenile or infantile. However that doubt can be resolved when thought is given to the students' acts and the extreme consequences which could have occurred. An infant would not have had the strength to throw the steel missile which could so easily have caused death.

Students rightfully seeking enforcement of their constitutional rights must accept the duties of responsible citizens. They must not confuse their constitutionally protected right of free speech with an illusive and nonexistent right to violently disrupt. They cannot be adults when they choose to be and juveniles when that course of conduct appeals to them more. *Buttny* says, "We agree with the students that the doctrine of 'In Loco Parentis' is no longer tenable in a university community," but conduct such as that with which we are here faced gives cause for pause to wonder if the law may not be forced to retreat to the earlier In Loco Parentis doctrine. The com-

ments of Justice Blackmun in *Esteban* bear repeating (415 F.2d 1078, 1089):

"These plaintiffs are no longer children. While they may have been minors, they were beyond the age of 18. Their days of accomplishing ends and status by force are at an end. It was time they assumed at least the outward appearance of adulthood and of manhood. The mass denial of rights of others is irresponsible and childish. So is the defiance of proper college administrative authority. * * * One might expect this from the spoiled child of tender years. One does not expect it from the college student who has two decades of life and who, in theory, is close to being 'grown up.' "

University officials are charged with the responsibility of conducting a well ordered institution, and in carrying out their responsibility they have not only the right but the duty to adopt and enforce such policies and regulations as may seem to them in their fair, reasoned best judgment to be required by the factual situation with which they are faced. The Court finds and concludes that this responsibility and duty was met and carried out by Colorado State University officials with fairness, temperance, reason and understanding.

■ The constitutional right of freedom of speech is the right to dissent, but it is not the unfettered right to disrupt by force and violence, and it is not the unqualified right to interfere with the rights and safety of others. The Court unhesitatingly finds and concludes that the policy adopted by Colorado State University officials (or some similar policy) was and is not only reasonable under the incendiary conditions shown to be then existing on that campus; it was and is required by those conditions. It is indeed unfortunate from the standpoint of the overwhelming majority of reasonable students that such a policy is required because of the acts of an unruly and misguided few, but this is an inevitable price paid by all age groups when it becomes necessary to deal with a lunatic fringe. That these plaintiffs may not

have wanted violence is of no moment when it had been conclusively shown that such demonstrations resulted in violence. All too frequently, regulations must be made to control the noisy few—not the orderly majority. "In an analogous situation, Mr. Justice Holmes, speaking for a unanimous Court, said ' * * * when it is necessary in order to prevent an evil to make the law embrace more than the precise thing to be prevented it may do so.' Westfall v. United States, 274 U.S. 256, 259, 47 S.Ct. 629, 71 L.Ed. 1036." These are the words of Mr. Justice Douglas, in Perez v. United States, 402 U.S. 142, 91 S.Ct. 1357, 28 L.Ed.2d 686, decided April 26, 1971.

The record shows the exercise of great patience on the part of the University officials, and it is only because of their tolerance and patience that there has been more or less "peace in our time" on the school's campus. Plaintiffs' statement that they do not condone violence is made in the teeth of the testimony of plaintiff Evans that his group wanted an opportunity to participate in civil disobedience and in full view of the events of February 5, 1970, at Moby Gymnasium. If the relief the plaintiffs here seek were to be granted, such an order would be an open invitation to the probable accomplishment of violence. The Court respectfully declines plaintiffs' invitation.

The University policy here under attack is not overbroad. It was hastily drawn, but it was drawn with adequate certainty. It is reasonable. It deprives plaintiffs of no constitutional rights, although most assuredly it was required to be enacted only because of the actions of a very small group of disruptive students—actions which demanded a policy such as this. It announced as University policy the reasoned best judgment of University officials, and in the exercise of that same best judgment, the State Board of Agriculture has ordered the policy placed on file. No legally sufficient attack has been made on the validity of the University's policy and that policy will not be disturbed by this Court.

It Is Ordered that judgment enter in favor of defendants and that plaintiffs' complaint be dismissed. Defendants are awarded their costs.