Linda DENNO, as parent, legal guardian and next friend for Wayne Denno, Plaintiff-Appellant,

v.

SCHOOL BOARD OF VOLUSIA COUNTY, FLORIDA;  Dennis Roberts, an individual, et al., Defendants-Appellees.

No. 98-2718.

United States Court of Appeals,

Eleventh Circuit.

July 20, 2000.

Appeal from the United States District Court for the Middle District of Florida. (No. 96-00763-CV-ORL-22B), Anne C. Conway, Judge.

ON PANEL REHEARING[*]

Before ANDERSON, Chief Judge, BLACK, Circuit Judge, and FORRESTER[**], District Judge.

ANDERSON, Chief Judge:

Appellant, Linda Denno as parent and next friend for Wayne Denno ("Denno"), filed this complaint against Volusia County School Board ("Board") and Assistant Principals Dennis Roberts and Robert Wallace ("individual defendants") alleging deprivation of First Amendment rights in violation of 42 U.S.C. § 1983. With respect to the § 1983 claim against the individual defendants, the district court dismissed the complaint pursuant to Fed.R.Civ.P. 12(b)(6) on the basis of qualified immunity.  With respect to the § 1983 claim against the Board, the district court granted summary judgment in favor of the Board.  Denno appeals.

We address two discrete issues on appeal.[1]  First, Denno contends that the district court erred in dismissing the § 1983 claim as to the individual defendants pursuant to Fed.R.Civ.P. 12(b)(6) on the basis

---

[*]The previous opinion of this panel published at 182 F.3d 780 (11th Cir.1999), was vacated and withdrawn and panel rehearing was ordered.  *Denno v. School Board of Volusia County, Florida,* 193 F.3d 1178 (11th Cir.1999).

[**]Honorable J. Owen Forrester, U.S. District Judge for the Northern District of Georgia, sitting by designation.

[1]We reject Denno's other arguments on appeal without need for discussion.

of qualified immunity. Second, Denno argues that the district court erred in granting summary judgment in favor of the Board on the § 1983 claim. We address each issue in turn.

## I. QUALIFIED IMMUNITY FOR THE INDIVIDUAL DEFENDANTS

Qualified immunity shields government officials from both suit and liability if their conduct violates no clearly established right of which a reasonable person would have known. *See Santamorena v. Georgia Military College,* 147 F.3d 1337, 1339-40 (11th Cir.1998)(citing *Williams v. Alabama State Univ.,* 102 F.3d 1179, 1182 (11th Cir.1997)). Elaborating on the qualified immunity standard, we have held:

> For qualified immunity to be surrendered, preexisting law must dictate, that is, truly compel, (not just suggest or allow or raise a question about), the conclusion for every like-situated, reasonable government agent that what defendant is doing violates federal law in the circumstances.

*Lassiter v. Alabama A&M Univ.,* 28 F.3d 1146, 1150 (11th Cir.1994)(en banc). We also held in *Lassiter* that the qualified immunity standard sets up a bright-line test that is a powerful constraint on causes of action under § 1983. Quoting from and elaborating on *Dartland v. Metropolitan Dade County,* 866 F.2d 1321 (11th Cir.1989), we noted:

> When "no bright-line standard puts the reasonable public employer on notice of a constitutional violation, the employer is entitled to immunity except in the extraordinary case where [First Amendment case law] would lead to the inevitable conclusion that the [act taken against] the employee was unlawful." Unless a government agent's act is so obviously wrong, in the light of pre-existing law, that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing, the government actor has immunity from suit.

*Id.* at 1149 (quoting *Dartland,* 866 F.2d at 1323-24). One way that a plaintiff can satisfy the qualified immunity standard is to point to case law which predates the official's alleged improper conduct, which case law involves materially similar facts and truly compels the conclusion that the plaintiff had a right under federal law. *See Santamorena,* 147 F.3d at 1340.[2]

Whether the instant complaint alleges a violation of such a clearly-established right is a question of law subject to *de novo* review. *See Santamorena,* 147 F.3d at 1340. The district court dismissed Denno's

---

[2]*Santamorena* notes that this is the usual rule, and notes possible exceptions. *Id.* at 1340 n. 6.

claim against the individual defendants pursuant to Fed.R.Civ.P. 12(b)(6) based on qualified immunity. In the posture of this case, we are required to assume all reasonable inferences from the complaint in favor of Denno. *See id.* We briefly summarize the facts alleged in the complaint that are relevant to this issue.

At the time of the events giving rise to the instant case, Wayne Denno was a minor and a student at Pine Ridge High School. Dennis Roberts and Robert Wallace were assistant principals at that school. As a hobby, Wayne Denno had cultivated a keen interest in Civil War history. In his free time, Denno participated in Civil War reenactments and living histories. His hobby led him to join a reenactment group known as the Florida Light Artillery, Battery B, with which he participated in Civil War reenactments and living histories both within Florida and elsewhere in the South.

On December 13, 1995, during an outdoor lunch break at school, Wayne Denno was quietly conversing with a small group of friends, discussing his avocation of Civil War history and his hobby as a Civil War reenactor. As part of this discussion, Wayne Denno displayed to his friends a 4" × 4" Confederate battle flag as he discussed historical issues of Southern heritage. Without any provocation or disruption, defendant Roberts approached and observed a couple of students with apparel bearing Confederate symbols. Without any explanation, defendant Roberts ordered the students to remove or cover the Confederate symbols on their apparel, and also ordered Denno to put away his small flag. When Denno tried to explain the historical significance of the flag, Roberts ordered Denno to accompany him to an administrative office and on the way there advised Denno that he was suspended from school. At the administrative office, another student was detained for wearing a tee-shirt displaying the Confederate flag, and ordered to turn his shirt inside-out so as to conceal the flag. Denno urged the student to adhere to his principles and not submit to the alleged violation of his First Amendment rights.

Denno's complaint alleges that his suspension constituted an unconstitutional deprivation of his First Amendment rights. As indicated in our elaboration above of the qualified immunity standard, pre-existing law must clearly establish the alleged constitutional right. Thus, we examine the legal landscape at the time

of the individual defendant's actions.  That legal landscape is dominated by two Supreme Court cases, *Tinker v. Des Moines Independent Community School District,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), and *Bethel School Dist. No. 403 v. Fraser,* 478 U.S. 675, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986).

In *Tinker,* several Iowa high school and junior-high school students were suspended for wearing black armbands to school in protest of the Vietnam War. The Supreme Court found that the students "merely went about their ordained rounds in school" and "neither interrupted school activities nor sought to intrude in the school affairs or lives of others" by their wearing of the black cloth.  *Id.* at 514, 89 S.Ct at 740.  The Court held that a student has a First Amendment right to display the armband at school, notwithstanding the school officials' fear that display of the symbol would create a disturbance, so long as there was no more than an "undifferentiated fear or apprehension of disturbance."  *Id.* at 508, 89 S.Ct. at 737.  On the other hand, the Court in *Tinker* indicated that school officials could have appropriately prohibited the display of the armband if there were circumstances that would warrant a reasonable fear on the part of the school officials that the display would appreciably disrupt the appropriate discipline in the school.  *See id.* at 514, 89 S.Ct. at 740.

In 1986, the Supreme Court again addressed the First Amendment rights of students in public schools. In *Bethel Sch. Dist., No. 403 v. Fraser,* 478 U.S. 675, 106 S.Ct. 3159, 92 L.Ed.2d 549, a high school student was disciplined following his speech to a school assembly nominating a fellow student for student elective office.  The speech contained explicit sexual metaphor.  The Court held that the school district was within its permissible authority in imposing the discipline.  After stating that one of the purposes of public education is to inculcate the habits and manners of civility as values conducive both to happiness and to the practice of self-government, the Court stated:

> These fundamental values of "habits and manners of civility" essential to a democratic society must, of course, include tolerance of divergent political and religious views, even when the views expressed may be unpopular.  But these "fundamental values" must also take into account consideration of the sensibilities of the others, and, in the case of a school, the sensibilities of fellow students.  The undoubted freedom to advocate unpopular and controversial views in schools and classrooms must be balanced against the society's countervailing interest in teaching students the boundaries of socially appropriate behavior.

*Id.* at 681, 106 S.Ct. at 3163.  After noting that the constitutional rights of students in public schools are not automatically coextensive with the rights of adults in other settings, the Court stated:

> Surely it is a highly appropriate function of public school education to prohibit the use of vulgar and offensive terms in public discourse.  Indeed, the "fundamental values necessary to the maintenance of a democratic political system" disfavor the use of terms of debate highly offensive or highly threatening to others.  Nothing in the Constitution prohibits the states from insisting that certain modes of expression are inappropriate and subject to sanctions.  The inculcation of these values is truly the "work of the schools."  *Tinker,* 393 U.S. at 508, 89 S.Ct. at 737....  The determination of what manner of speech in the classroom or in school assembly is inappropriate properly rests with the school board.
>
> The process of educating our youth for citizenship in public schools is not confined to books, the curriculum, and the civics class;  schools must teach by example the shared values of a civilized social order.  Consciously or otherwise, teachers—and indeed the older students—demonstrate the appropriate form of civil discourse and political expression by their conduct and deportment in and out of class.

*Id.* at 683, 106 S.Ct. at 3164.[3]

The issue before us with respect to the individual defendants is whether every reasonable school official in the same circumstances would have known in light of the preexisting law that his actions violated First Amendment rights.  In other words, were the actions so obviously wrong, in light of preexisting law, that only a plainly incompetent school official or one who was knowingly violating the law would have done such a thing.

Such a reasonable school official would be charged with knowledge of *Tinker* and *Fraser.*  In our attempt to identify the legal landscape that would have been apparent to such a reasonable school official, it is instructive to take note of the perspective of several reasonable jurists who have attempted to articulate the legal landscape in light of *Tinker* and *Fraser.*

In *Muller by Muller v. Jefferson Lighthouse School,* 98 F.3d 1530 (7th Cir.1996), the Seventh Circuit was presented with a claim brought by an elementary school child challenging the school's restriction on the

---

[3]We respectfully disagree with the dissent's suggestion that we are relying upon dicta from *Fraser.*  We believe that the rationale reflected in our quotations from *Fraser* was relied upon by the Supreme Court in reaching its holding.  It is this rationale that has significance for this appeal.  *See infra.*

child's attempt to distribute, during non-instructional times, invitations to a religious meeting. The court

upheld the school's restrictions, applying a flexible reasonableness standard, namely whether the restrictions

were reasonably related to legitimate pedagogical concerns. *See id.* at 1540. The court rejected plaintiffs'

argument, based upon *Tinker,* that the school was a public forum, with respect to personal

intercommunication amongst students. Holding that intercommunication amongst students was indeed

important, but was only one of many important school activities, the court stated:

> Supreme Court decisions since *Tinker* indicate that the teaching of civility and the inculcation of tradition moral, social, and political norms may override student expression, or at least that it is permissible for a school board to so order its educational priorities. *Fraser,* 478 U.S. at 681 & 683, 106 S.Ct. at 3163 & 3164; *Hazelwood,* 484 U.S. at 271-72, 108 S.Ct. at 570-71.
>
> Further, the potential "verbal cacophony" of a public forum, *see Cohen v. California,* 403 U.S. 15, 25, 91 S.Ct. 1780, 1788, 29 L.Ed.2d 284, can be antithetical to the delicate "custodial and tutelary" environment of an elementary school. *See Vernonia School Dist. 47J v. Acton,* 515 U.S. 646, 115 S.Ct. 2386, 2392, 132 L.Ed.2d 564 (1995). The cultivation of the "habits and manners of civility" that *Fraser* held "essential to a democratic society," 478 U.S. at 681, 106 S.Ct. at 3163, can require a level of parent-like guidance that has no place in a public forum. Declaring the elementary school classroom, hallway, or playground forums for unfettered student communication would require either a severe incursion into the critical educational mission of the elementary school or a substantial contraction of the First Amendment protections afforded speech in a public forum. Perhaps both. But neither alteration is necessary on the facts before us. In a public forum, the Christian can tell the Jew he is going to hell, or the Jew can tell the Christian he is not one of God's chosen, no matter how that may hurt. But it makes no sense to say that the overly zealous Christian or Jewish child in an elementary school can say the same thing to his classmate, no matter the impact. Racist and other hateful views can be expressed in a public forum. But an elementary school under its custodial responsibilities may restrict such speech that could a crush a child's sense of self-worth.

*Id.* at 1539-40. Thus, the Seventh Circuit, relying heavily upon *Fraser* applied a flexible reasonableness

standard in analyzing a claim very similar to the claim made by Denno in the instant case.

In 1998 the United States Court for the District of Kansas addressed a challenge concerning a factual

situation indistinguishable from the instant one. In *West v. Derby Unified School Dist. No. 260,* 23 F.Supp.2d

1223 (D.Kan.1998), *aff'd,* 206 F.3d 1358 (10th Cir.2000), the court addressed a challenge to a disciplinary

action against a middle school student who had drawn and circulated a picture of the Confederate flag. The

court, as have we, identified the two most relevant Supreme Court cases as being *Tinker* and *Fraser.* Because

of the history of racial tensions in that school system, the court concluded that the school system adequately

**6**

supported its policy prohibiting the display at school of the Confederate flag under the *Tinker* standard—*i.e.,* the display would likely lead to a material and substantial disruption of the school's discipline. Of greater relevance to the instant case, however, the *West* court held alternatively that the school's policy was supported by the reasoning of *Fraser.* The court noted *Fraser's* "habits and manners of civility" language, and quoted *Fraser's* balancing test:

> "The undoubted freedom to advocate unpopular and controversial views in schools and classrooms must be balanced against the societies countervailing interest in teaching students the boundaries of socially appropriate behavior"

*West,* 23 F.Supp.2d at 1233 (quoting *Fraser,* 478 U.S. at 681, 106 S.Ct. at 3163). Applying that balancing test, the court held:

> Part of a public school's essential mission must be to teach students of differing races, creeds and colors to engage each other in civil terms rather than in "terms of debate highly offensive or highly threating to others."... There is no evidence that the school district has attempted to suppress civil debate on racial matters, but the district had concluded that the display of certain symbols that have become associated with racial prejudice are so likely to provoke feelings of hatred and ill will in others that they are inappropriate in the school context.

*Id.* at 1233-34 (quoting from *Fraser,* 478 U.S. at 683, 106 S.Ct. at 3164).[4]

Thus, two courts viewing the relevant legal landscape have applied in analogous situations a more flexible reasonableness or balancing standard rather than, or in addition to, the *Tinker* standard of whether there is a reasonable fear of disruption. *See also Baxter by Baxter v. Vigo County School Corp.,* 26 F.3d 728, 736 (7th Cir.1994) (citing *Fraser* and commenting "[s]ince *Tinker,* however, the Supreme Court has cast some doubt on the extent to which students retain free speech rights in the school setting").

---

[4]On appeal, the Tenth Circuit affirmed the district court and adopted the reasoning of the district court's first holding, *i.e.,* that under *Tinker* the restriction was permissible because, in light of past events at the school, "a student's display of the Confederate flag might cause disruption and interfere with the rights of other students to be secure and let alone." *West v. Derby Unified School Dist. No. 260,* 206 F.3d 1358, 1366 (10th Cir.2000). Although the appellate court evidently found this holding more appealing, it did not disavow the alternative holding. Moreover, the fact that the district court judge found the legal landscape so unclear as to include the alternative *Fraser* holding discussed above remains strong evidence that the law was not clearly established that *Tinker* prohibited the individual defendants' actions, as opposed to the more flexible reasonableness or balancing standard of *Fraser* permitting them, in the instant case.

**7**

In light of the holding and language in *Fraser,* and the interpretation of the *Tinker-Fraser* landscape by reasonable jurists, we cannot conclude that pre-existing law dictates or truly compels the conclusion that the *Tinker* standard should apply in the instant case to the exclusion of the *Fraser* standard. We have noted that it would be inappropriate to hold government officials to a higher level of knowledge and understanding of the legal landscape than the knowledge and understanding displayed by judges whose everyday business it is to decipher the meaning of judicial opinions. *See Barts v. Joyner,* 865 F.2d 1187, 1194 (11th Cir.1989). The fact that reasonable jurists have applied *Fraser* 's more flexible standard in cases similar to the instant case is a strong indication that a reasonable school official might see the *Tinker-Fraser* legal landscape as including the more flexible *Fraser* standard. Moreover, such a reasonable official might have noted that the *Fraser* opinion pointed out that the *Tinker* Court itself "was careful to note that the case did not 'concern speech or action that intrudes upon the work of the schools or the rights of other students.' " *Fraser,* 478 U.S. at 680, 106 S.Ct. at 3163 (quoting *Tinker,* 393 U.S. at 508, 89 S.Ct. at 737). Such official might have further noted that the *Fraser* Court contemplated that the "work of the schools" included the inculcation of fundamental values relating to the habits and manners of civility. *Id.* at 683, 106 S.Ct. at 3164. Thus, such a reasonable school official might have been led to the view that the legal landscape permitted application of the more flexible *Fraser* standard where the speech involved intrudes upon the function of the school to inculcate manners and habits of civility.[5] The instant case involves display of the Confederate flag during school hours and on school premises. We do not believe that it would be unreasonable for a school official

---

[5]We realize that strong arguments can be mounted to the effect that the more flexible *Fraser* standard is limited to situations in which the speech involved is likely to be perceived as bearing the imprimatur of the school. *See Hazelwood School Dist. v. Kuhlmeier,* 484 U.S. 260, 270-73, 108 S.Ct. 562, 569-71, 98 L.Ed.2d 592 (1988). However, we need not today decide the correct legal standard. Neither party has argued that we must decide the *merits* of the substantive constitutional issue before addressing qualified immunity. And we believe that this appeal is one of those exceptional cases in which we are not required to do so. *See Santamorena v. Georgia Military College,* 147 F.3d at 1342-43 (discussing the "better approach" of resolving the substantive constitutional issue first, and the relevant Supreme Court cases including *County of Sacramento v. Lewis,* 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998)). Thus, we need decide only whether pre-existing law dictates, that is, truly compels the conclusion that the *Tinker* standard applies to the exclusion of the *Fraser* standard. *See Lassiter,* 28 F.3d at 1150. We cannot so conclude.

to believe that such displays have uncivil aspects akin to those referred to in *Fraser,* in that many people are offended when the Confederate flag is worn on a tee-shirt or otherwise displayed.[6] We cannot conclude that only a plainly incompetent school official would have viewed the instant circumstances as implicating legitimate school functions relating to civility, and thus subject to the school's authority under the more flexible *Fraser* standard to balance the freedom of one student to advocate unpopular and controversial views at school against the school's countervailing interest in teaching students the boundaries of socially appropriate behavior.

To the extent that a reasonable school official viewed the relevant legal landscape as including the more flexible *Fraser* standard, the official would look not merely to the reasonable risk of disruption (the *Tinker* standard), but would also balance the freedom of Denno and the similarly situated students to advocate unpopular and controversial views against the school's interest in teaching students the boundaries of socially appropriate behavior. We cannot conclude that the actions of the individual defendants in the instant case violated clearly-established First Amendment rights under the more flexible *Fraser* standard. Denno points to no case, binding or otherwise, in which materially similar actions of school officials have been held to violate First Amendment rights under the *Fraser* standard. Our research has uncovered no such cases.[7] As indicated above, the application of the *Fraser* standard in the instant case would involve balancing the freedom of Denno and the other similarly situated students to advocate unpopular or controversial views

---

[6]The fact that Denno alleges that he had no racist intentions, an allegation which we accept as true, is not dispositive. Similarly, it is not dispositive that common experience teaches us that the Confederate flag is honored by many people as a non-racist memorial to their Southern heritage; common experience also teaches that many people perceive the flag as offensive, constituting either a racist message or at least reflecting an uncivil lack of sensitivity to the sensibilities of many people. The more relevant factor is that the school official might reasonably think that other students would perceive the display as racist or otherwise uncivil. The issue also is not whether the official's perception is accurate or justified; rather, the issue is whether only an incompetent school official would have such a perception.

[7]Indeed, Denno does not argue that there was a violation of clearly-established First Amendment rights under the *Fraser* standard; he argues only that the *Tinker* standard applies to the exclusion of the *Fraser* standard.

against the school's interest in promoting civil discourse amongst students at school. The balancing analysis under the *Fraser* standard would be analogous to that discussed by this court in a case involving a public employer's discharge of an employee because of the employee's comments to the press on matters of public concern. *See Dartland v. Metropolitan Dade County,* 866 F.2d 1321 (11th Cir.1989). In granting summary judgment for the public official who fired Dartland, we described the analysis as follows:

> The Supreme Court has never established a bright-line standard for determining when the State as an employer may take action adverse to an employee in response to that employee's speech. Instead, the Court has balanced the interest of the employee in commenting on matters of public concern against the interest of the employer in performing public services efficiently. *Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 1734-35, 20 L.Ed.2d 811 (1968). The court must necessarily balance these interests on a case-by-case basis. Because of this case-by-case approach, "[t]here will rarely be a basis for [an] *a priori* judgment that termination or discipline of a public employee violated 'clearly established' constitutional rights".... Because no bright-line standard puts the reasonable public employer on notice of a constitutional violation, the employer is entitled to immunity except in the extraordinary case where *Pickering* balancing would lead to the inevitable conclusion that the discharge of the employee was unlawful.

*Id.* at 1323 (quoting *Noyola v. Texas Dep't of Human Resources,* 846 F.2d 1021, 1025 (5th Cir.1988)) (footnote omitted). Similarly, we cannot conclude that a *Fraser* balancing of the circumstances in the instant case would lead to the inevitable conclusion that the individual defendants here violated the First Amendment rights of the students. We cannot conclude that the prohibition of the displays of the Confederate flag in this case are "so obviously wrong, in the light of pre-existing law, that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing." *Lassiter,* 28 F.3d at 1149.

Thus, we affirm the district court's dismissal of the § 1983 claim against the individual defendants.[8] We turn to Denno's challenge to the district court's grant of summary judgment in favor of the Board.

## II. LIABILITY OF THE BOARD

_____

[8]Denno argues that the district court erred in applying heightened pleading standard. In making this argument in the district court, Denno moved for a reconsideration and proffered an amendment to his complaint. We need not address Denno's argument; we have considered his complaint as if amended by this proffered amendment, and conclude that neither it nor the heightened pleading issue would affect our holding.

*Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), holds that local governments (and branches thereof)[9] may not be held liable for constitutional deprivations on the theory of *respondeat superior.* Rather, they may be held liable only if such constitutional torts result from an official government policy, the actions of an official fairly deemed to represent government policy, or a custom or practice so pervasive and well-settled that it assumes the force of law. *See id.* at 694, 98 S.Ct. at 2037-38; *Sewell v. Town of Lake Hamilton,* 117 F.3d 488, 489 (11th Cir.1997); *Church v. City of Huntsville,* 30 F.3d 1332, 1343 (11th Cir.1994). In order for the actions of a government official to be deemed representative of the municipality, the acting official must be imbued with final policymaking authority. *See Pembaur v. City of Cincinnati,* 475 U.S. 469, 481, 106 S.Ct. 1292, 1299, 89 L.Ed.2d 452 (1986). Unlike the qualified immunity issue discussed above, the district court permitted the § 1983 claims against the Board to proceed beyond the pleadings stage; however, the district court granted summary judgment in favor of the Board.

Because Denno does not argue that the Board maintained any official policy prohibiting Confederate symbols, our resolution of this claim hinges on two issues: 1) whether the Pine Ridge High School administrators were officials vested with final policymaking authority, and 2) whether a custom or practice banning Confederate symbols existed. The district court answered both queries in the negative and accordingly granted summary judgment in favor of the Board. We agree with that assessment for the following reasons.

A.     *Final Policymaking Authority*

*Scala v. City of Winter Park,* 116 F.3d 1396 (11th Cir.1997), serves as our compass in the area of determining whether officials act with final policymaking authority so as to trigger entity liability under *Monell.* In *Scala,* drawing on *City of St. Louis v. Praprotnik,* 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107

---

[9]School boards constitute branches of local government and thus may be subject to liability under *Monell. See Arnold v. Board of Escambia County,* 880 F.2d 305, 310 (11th Cir.1989).

(1988)(plurality opinion), we squarely held that "[f]inal policymaking authority over a particular subject area does not vest in an official whose decisions in the area are subject to meaningful administrative review." *Scala,* 116 F.3d at 1401. With this "embedded" principle in mind, *id.,* we find Denno's argument that the school administrators possessed final policymaking authority unpersuasive.

Policy 208 of the Volusia County School Board, entitled "Code of Student Conduct and Discipline," sets forth a successive three-step grievance procedure for the resolution of "complaints filed by a student or parent/guardian with regard to their respective rights under school board policy, school rule, state or federal law." Step 1 involves meeting with the school principal informally; Step 2 involves review by the area assistant superintendent; and Step 3 permits a student to request a hearing if dissatisfied with the previous two steps. *See* Policy 208 at 14-15. In order to trigger review by the area assistant superintendent, the grievant is required to file a copy of the grievance form with the area assistant superintendent within 7 days of the meeting with the principal outlined in Step 1. *See* Policy 208 at 14.

The district court concluded that Policy 208, the "Code of Student Conduct and Discipline," provided for meaningful review of the school officials' disciplinary decisions, but concluded that Denno did not timely comply with the requirements for seeking review under Step 2. The court relied on Policy 208 itself and on a letter dated April 22, 1996, from Area Assistant Superintendent Lee Britton, stating that Denno had failed to pursue the appeal of his suspension in timely fashion and had therefore waived the opportunity to request the hearing mentioned in Step 3 of the grievance procedure. Indeed, it appears that Denno did not pursue an appeal in timely fashion and never filed a copy of the grievance form necessary to proceed with Step 2 of the review procedure.

As a matter of law, we agree with the district court that the "Code of Student Conduct and Discipline" allowed for meaningful review of Denno's suspension. The fact that Denno had to file an appeal with the area assistant superintendent before his suspension could be reviewed does not make the school administrators final policymakers. *Scala* clearly states that this circuit equates meaningful review with the opportunity for

**12**

meaningful review. *See Scala,* 116 F.3d at 1402 ("It is clear that [officials] do not become policymakers for § 1983 purposes simply because persons who disagree with their decisions have to file an appeal in order to have those decisions reviewed."). In other words, automatic review need not be made available when the opportunity for meaningful review is present. The express review mechanisms set into place by the grievance procedures detailed in the "Code of Student Conduct and Discipline" satisfy us that such opportunity existed in the instant case. Therefore, given the availability of this review, we agree with the district court that the Pine Ridge High School administrators were not final policymakers so as to make the Board liable under *Monell.*

B.      *Custom or Practice*

In order for the Board to be held liable under the custom or practice prong of *Monell,* Denno must demonstrate that a custom or practice of banning the Confederate flag at high schools within the school district is so well-settled and pervasive that it assumes the force of law. *See Sewell v. Town of Lake Hamilton,* 117 F.3d 488, 489 (11th Cir.1997). Put another way, Denno must show a "persistent and widespread practice" of prohibiting the Confederate emblem about which the Board knew or of which practice it had constructive knowledge, because "[n]ormally random acts or isolated incidents are insufficient to establish a custom...." *Church v. City of Huntsville,* 30 F.3d 1332, 1345 (11th Cir.1994) (quoting *Depew v. City of St. Marys,* 787 F.2d 1496, 1499 (11th Cir.1986)).

The district court held that a custom of prohibiting the Confederate flag from being displayed on school grounds could not be attributed to the Board. While Denno correctly points out that three other students were disciplined for similar displays of the flag in December 1995, these incidents transpired in the immediate aftermath of Denno's suspension in an effort to maintain discipline amongst the students and did not represent a persistent and widespread practice of the Board.[10] Indeed, Wayne Denno's own testimony

---

[10]Apparently, after Denno was suspended, the Dennos relayed the information to the local press. Pine Ridge Principal Sandra Rowe learned of the story covering Denno's suspension, and according to Denno, issued an unwritten ban of the Confederate flag to the faculty in a meeting held on December 15, 1995. The

**13**

undermines his argument that there was a custom or practice of banning the flag. Denno stated in his deposition that he had previously displayed the Confederate flag on school grounds and had not been disciplined and had witnessed others do so without consequence. In fact, Denno could not recall any student, prior to his suspension, suffering punishment for the display of the Confederate flag at Pine Ridge High School. Nor did Denno adduce evidence of similar suspensions at other schools within the school district governed by the Board. Given the lack of evidence with respect to the prohibition of the Confederate flag at Pine Ridge or at other schools within the district, we agree with the district court that Denno failed to adduce evidence creating a genuine issue of fact as to a pervasive and well-settled custom of banning the Confederate flag so as to make the Board potentially liable under *Monell.*

For the foregoing reasons, we agree with the district court that, under *Monell* and its progeny, the Board cannot be held liable. Thus, we affirm the district court's grant of summary judgment in favor of the Board.

## III. CONCLUSION

We affirm the district court's Rule 12(b)(6) dismissal of Denno's § 1983 claims against the individual defendants and affirm the district court's grant of summary judgment in favor of the Board.

AFFIRMED.

FORRESTER, District Judge, concurring in part and dissenting in part:

The facts of this case raise at least two questions to anyone even minimally familiar with First Amendment jurisprudence. The first question, which immediately explodes into the mind, is whether the school official could require Denno to put away his flag. The majority makes an attractive case that the law, applied to our facts, was not clearly established on that point in December 1995. Because of this finding, the

---

three other students who were disciplined after Denno for displaying the Confederate flag were disciplined subsequent to the December 15th meeting. However, for the reasons discussed above, the Principal was not a final policymaker, and for the reasons discussed in the text, there is no evidence that the unwritten ban was sufficiently pervasive or well-settled to have put the Board on notice.

majority affirms the school officials' right to qualified immunity. The second question—whether Denno could be suspended from school for nine days for displaying the flag under the circumstances pled—does not so quickly engage the mind, but this is the issue presented to the court for decision. Denno seeks not a declaration of his right to his particular speech, but rather to relief from school-imposed discipline suffered on account of the content of his speech. Since at least 1966, case law binding on this circuit has prohibited student discipline on account of their speech unless the speech actually caused material and substantial disruption of the school environment.

*Further Facts*

In addition to the facts set out in the majority opinion, the following facts are pled in the complaint and are important to the issue before us. An assistant principal approached the group of students, which included Denno, because he saw that several students in the group had Southern symbols on their clothes. Only at that time did he notice Denno's flag. He told Denno to put it away. Denno explained what he was doing, and the assistant principal told him to "shut up." The assistant principal said that he considered the flag a racist symbol. When Denno asked about his First Amendment rights, the assistant principal replied that Denno had no rights at the school. Denno was suspended in part for attempting to incite a riot because he paraded a Confederate flag during lunch period.

Equally important to this discussion are those facts not pled in the complaint. The complaint alleges no history of prior racial tension in the school. There is no contention that the school had an official policy specifically prohibiting Denno's conduct. There is no allegation that Denno's flag was seen by any African-American or other individual who might find the flag offensive,[1] nor is there any allegation of student

---

[1] Some could argue that the Confederate battle flag displayed by Denno would be inherently disruptive because Florida was a member of the Confederate States of America and the present population therefore consists in large part of the descendants of former slaves and the descendants of former slave owners, with the perceived animosities that allegedly result from such a mix. Although, as indicated, the complaint makes no allegations of disruption, to the extent it is thought relevant, the following legislative facts bear heavily upon the argument just mentioned. *See United States v. Bowers,* 660 F.2d 527, 530 (5th Cir. Unit B 1971) ("Legislative facts are established truths, facts or pronouncements that do not change from case to case but

**15**

misconduct at the time the flag was displayed, or afterward, as a result of Denno's having the battle flag. The question, as indicated, is whether on these facts the law was clearly established that Denno could not be disciplined for his speech.

*"Clearly Established Law" and Qualified Immunity*

One has only to survey the precedent relevant to the appeal at bar, and note the varying rationales of the many judges and justices who have written on the subject, to understand that a school official might have any one of a variety of subjective responses to the two questions presented here. Indeed, many people feel, especially in light of recent incidents of violence in our nation's schools, that the paramount role of school officials is to thwart even the most remote possibility of disharmony on the school grounds. Thus, a school official might personally feel that the inculcation of manners and civility warranted the actions taken by the school officials in the instant case. Our circuit, of course, recognizes that it is to apply an objective standard when judging what reasonable officials would understand about the rights created by federal law, and "the government actor's intent or motivation are insignificant in determining entitlement to qualified immunity." *Wood v. City of Lakeland, FL,* 203 F.3d 1288, 1291 (11th Cir.2000). *See also Evans v. Hightower,* 117 F.3d 1318, 1320 (11th Cir.1997); *Dolihite v. Maughon by and through Videon,* 74 F.3d 1027, 1041 (11th Cir.1996); *Lassiter v. Alabama A&M Univ. Bd. of Trustees,* 28 F.3d 1146, 1149 (11th Cir.1994) (en banc);

---

apply universally...."). The demographics of Deltona, Florida, where Pine Ridge High School is located, show that only 2.98% of its population is African-American. *See General Population and Housing Characteristics for Deltona, Florida* (visited July 7, 2000) <http ://factfinder.census.gov/java_prod/dads.ui.facCom munityFactsPage>. Moreover, a majority of Florida's present population traces its roots to somewhere other than the South. Only 24.7% of the population was born in Florida, and another 14.7% was born in other Southern states. Lucy Morgan, *Newcomers Proud to Be "Floridians",* St. Petersburg Times, July 15, 1999, at 1B. Florida's population, therefore, cannot fairly be described as a direct product of the Old South, as might be said of states like Georgia, where 66% of the population was born within the state, or South Carolina, where nearly 70% of the population was born within the state. *See Social Characteristics for Georgia; Social Characteristics for South Carolina* (visited July 7, 2000) <http://factfinder.census.gov/java_prod/ dads.ui.facCommunityFactsPage>. It should also be noted that the argument mentioned above presupposes that all white Southerners revere the flag and all black Southerners abhor it, presuppositions that are certainly questionable.

*Harris v. Coweta County,* 21 F.3d 388, 390 (11th Cir.1994). It is the objective reasonableness of the official's actions, and not his wisdom or good faith, that determines whether immunity attaches.

The majority finds that the decision of the Supreme Court in *Bethel Sch. Dist. No. 403 v. Fraser,* 478 U.S. 675, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986), sufficiently clouded the prior decision in *Tinker v. Des Moines Independent Community Sch. Dist.,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), so that the right pronounced in *Tinker* was not clearly established at the time the school officials acted in this case. A school official could certainly utilize excerpts from *Fraser* to fashion an argument that the law was not clearly established, just as the majority has done. The question, however, is whether it would be reasonable for him to do so in light of existing precedent. We learned in the seminal case of *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), that in practice, whether or not the law is clearly established is determined by the judge, and whether the official has properly determined it for himself is of no import. *Id.* at 818-19, 102 S.Ct. 2727 ("If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct."). For the layperson, as well as for judges, confusion about the state of the law most often comes about by confusing the holding of a case with the *dicta* in the opinion. It is well established in this circuit, however, that *dicta* are of no assistance in determining whether or not law is clearly established for the purpose of qualified immunity. *Jones v. Cannon,* 174 F.3d 1271, 1288 n. 11 (11th Cir.1999); *Hamilton v. Cannon,* 80 F.3d 1525, 1530 (11th Cir.1996).

*Was the Law Clearly Established?*

On July 2, 1966, the old Fifth Circuit Court of Appeals handed down the companion cases of *Burnside v. Byars,* 363 F.2d 744 (5th Cir.1966), and *Blackwell v. Issaquena County Bd. of Educ.,* 363 F.2d 749 (5th Cir.1966).[2] In both cases, students in all-black schools were wearing and distributing buttons put

---

[2]In *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions rendered by the former Fifth Circuit prior to October 1, 1981.

out by the Student Nonviolent Coordinating Committee.  In the *Blackwell* case, the buttons showed black and white hands joined and bore the word "SNCC." *Blackwell,* 363 F.2d at 750.  In the *Burnside* case, the buttons had the words "One Man One Vote" and "SNCC." *Burnside,* 363 F.2d at 746.  Both cases arose after students challenged the suspensions they received for incidents involving the buttons.

In the *Blackwell* case, the episode began when approximately 150 pupils came to school wearing the buttons.  These buttons were distributed in the corridors and pinned on the students even though they were not requested.  One younger student began crying.  The principal brought the students to the cafeteria and informed them that they were forbidden to wear the buttons at school.  Immediately thereafter, several students conducted themselves discourteously and displayed an attitude of hostility.  On the following day, 200 students appeared wearing the buttons.  They were assembled and told that if they returned the next day, they would be suspended.  On the third day, students again returned to school wearing the buttons and were immediately sent home by the principal.  One of the suspended students entered a classroom while class was in session and importuned another student to leave the class.  A bus driver was going about the school building with a cardboard box full of buttons and distributing them, even in active classrooms.  The district court found that there were numerous instances where students conducted themselves in a disorderly manner, disrupted classroom procedure, interfered with proper decorum and discipline of the school, and disturbed other students who did not wish to participate in wearing the buttons.  On these facts, the court of appeals found the school action reasonable and affirmed the decision of the lower court to deny the issuance of a preliminary injunction enjoining the suspensions. *Blackwell,* 363 F.2d at 754.

In *Burnside,* a number of students came to school wearing the buttons.  The principal told the entire student body that they were not permitted to wear these buttons in the schoolhouse or in various classes.  Despite this warning, three or four students appeared at school wearing the buttons the next day.  All were given an opportunity to remove them.  Three did not remove them and were sent home.  Several days afterwards, 30 or 40 students came to school displaying these buttons.  A teacher complained that they were

**18**

causing a commotion, and the principal gave the students the opportunity of removing the buttons or going home. A large number of those elected to return home, and they were suspended. The court of appeals noted that other students only showed a mild curiosity over the insignia, and even the principal testified that the children were expelled not for causing a commotion or disrupting classes but for violating a school regulation. *Burnside,* 363 F.2d at 748. The court found that the regulation was arbitrary and unreasonable, and directed the district court to enter an injunction forbidding its enforcement. The court concluded with these comments:

> [W]e must also emphasize that school officials cannot ignore expressions of feelings with which they do not wish to contend. They cannot infringe on their students' right to free and unrestricted expression as guarantee[d] to them under the First Amendment to the Constitution, where the exercise of such rights in the school buildings and school rooms do not materially and substantially interfere with the requirements of appropriate discipline in the operation of the school.

*Id.* at 749.

The next decision relevant to our question is *Tinker v. Des Moines Independent Community Sch. Dist.,* 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969). In this case, the United States Supreme Court reversed a decision by the lower court dismissing a complaint by several students who were suspended from school on account of wearing black armbands in protest of the war in Vietnam. The Court's holding rested on the absence of any evidence that the activity of the students materially disrupted class work or involved substantial disorder or invasion of the rights of others. *Id.* at 513, 89 S.Ct. 733. The case is the more remarkable for our purposes because it specifically bases its rationale on the Fifth Circuit's decisions in *Burnside* and *Blackwell. See id.*

After *Tinker,* the old Fifth Circuit was presented with a case involving the discipline of several Grambling College students. *See Jenkins v. Louisiana State Bd. of Educ.,* 506 F.2d 992 (5th Cir.1975). Although the case was decided after the decision in *Tinker,* Judge Roney, writing for the court, said that the rule of decision was provided by *Burnside,* as expounded upon in *Tinker. Id.* at 1002. The record before the court contained evidence of students hurling bricks, stones and bottles at the women's dormitories and of a Volkswagen being overturned in front of the administration building and stripped of its hubcaps. The court

said that the actions of the appellants in going about the campus shouting "organize," "unite," and "student power" subjected the teaching and learning atmosphere of the college to disruption, distraction and destruction. *Id.* at 1003. Finding the actions of the students more akin to those in *Blackwell* than to either *Burnside* or *Tinker* because the students' conduct involved material and substantial interference with the requirements of appropriate discipline in the operation of an educational institution, the court found that the speech was not protected by the First Amendment. *Id.*

The line of authority on the question *sub judice* seemingly ends with *Shamloo v. Mississippi State Bd. of Trustees of Inst. of Higher Learning,* 620 F.2d 516 (1980). In *Shamloo,* a number of Iranian students demonstrated on campus on several occasions in support of the new government of the Ayatollah Khomeini, and were subsequently suspended. Noting that the students were disciplined for failing to comply with the university's regulations concerning student demonstrations, the appellate court identified a three-step inquiry for analyzing their First Amendment claim. First, the court needed to determine whether the regulations were actually violated. Next, the court needed to consider whether the university's action in suspending the students violated their First Amendment rights by punishing them for protected activity. Finally, the court needed to examine the constitutionality of the regulations at issue. *Id.* at 520. Finding that the students did in fact violate the regulations, the court of appeals moved on to the second inquiry. In resolving this issue, the district court found that the demonstrations had a disruptive effect with respect to other students' rights and confirmed the suspensions of the student demonstration leaders. The court of appeals, however, said that this finding by the district court was insufficient to support the conclusion that the demonstrations were not protected by the First Amendment. According to the *Shamloo* decision, for conduct to be outside the protections of the First Amendment, a court must also find a material disruption of the classroom or that the conduct in question involved substantial disorder or an invasion of the rights of others. Put differently, for student demonstrations or other speech-related conduct to fall outside the protections of the Constitution, the conduct "must constitute a material and substantial interference with discipline." *Id.* at 522. Because the

**20**

district court had made no such findings, the court of appeals could not say that the demonstration was not protected by the First Amendment, and in light of that conclusion, the court moved on to the final inquiry, striking down the regulations as unconstitutionally vague. *Id.* at 522-24.

It seems, therefore, after reviewing the aforementioned precedent, that this circuit has two pairs of decisions—*Blackwell* and *Burnside,* and *Jenkins* and *Shamloo*—clearly setting out the *sine qua non* for the disciplining of a student because of his or her speech. As these cases show, the necessary condition for such discipline is a material and substantial interference with the educational environment or with the rights of other students. *See also Tinker,* 393 U.S. at 513, 89 S.Ct. 733. It should be noted also that the outcome is not at all dependent on the content of the speech. This could not be clearer than in the first couplet, where the buttons constituting the students' speech were virtually identical.

*What to Make of Fraser, Muller, and West*

Much of the majority opinion's case for qualified immunity depends on *Bethel Sch. Dist. No. 403 v. Fraser,* 478 U.S. 675, 106 S.Ct. 3159, 92 L.Ed.2d 549 (1986), *Muller by Muller v. Jefferson Lighthouse Sch.,* 98 F.3d 1530 (7th Cir.1996), and *West v. Derby Unified Sch. Dist. No. 260,* 206 F.3d 1358 (10th Cir.2000). As demonstrated below, none of these decisions dilutes the clearly established law just discussed.

In *Fraser,* a student at a large high school assembly nominated a peer for class office in "elaborate, graphic, and explicit sexual metaphor." *Fraser,* 478 U.S. at 677-78, 106 S.Ct. 3159. The assembly was a part of a school-sponsored educational program in self-government. The school had a disciplinary rule prohibiting the use of obscene language if the conduct materially and substantially interfered with the educational process. During the speech students hooted and yelled. The sexual activities alluded to were being graphically simulated by others. Some students were bewildered or embarrassed, and one teacher had to forego a portion of her class lesson the following day in order to discuss the speech with her pupils. After a hearing, Fraser was suspended for two days. The Supreme court affirmed that action.

**21**

*Fraser* stands for the proposition that a student may be suspended for materially and substantially interfering with the educational process; it stands for the proposition that a student may be suspended for insubordination with reference to an established school rule which is reasonable; and it stands for the proposition that a public school has the right to disassociate itself from certain speech. *Id.* at 685, 106 S.Ct. 3159; *see also id.* at 680, 106 S.Ct. 3159 (distinguishing *Tinker* on grounds that it "did not concern speech or action that intrudes upon the work of the schools or the rights of other students"). The rest of what Chief Justice Burger says in the majority opinion is *dicta* and, as such, does not bear on a determination of whether or not the law is clearly established for purposes of qualified immunity. It is, to be sure, an eloquent articulation of the role of school boards in inculcating civility, but it says nothing new that other courts have not said about the function of education. It is, in fact, an extension and elaboration on Chief Justice Burger's dissent in *Papish v. Bd. of Curators of the Univ. of Missouri,* 410 U.S. 667, 93 S.Ct. 1197, 35 L.Ed.2d 618 (1973), where the Supreme Court, in a majority per curiam opinion, held that expelling a student for distributing a publication on campus that allegedly contained indecent speech was unconstitutional.

"*Dictum* " is a term that has been variously defined. *Dictum* may be defined as "a statement in a judicial opinion that could have been deleted without seriously impairing the analytical foundations of the holding." *United States v. Crawley,* 837 F.2d 291, 292 (7th Cir.1988) (quoting *Sarnoff v. American Home Products Corp.,* 798 F.2d 1075, 1084 (7th Cir.1986)). *Dictum* may be defined as a statement not necessary to the decision and having no binding effect. *See id.* (quoting *American Family Mut. Ins. Co. v. Shannon,* 120 Wis.2d 560, 356 N.W.2d 175, 178 (1984)); Black's Law Dictionary 1100 (7th ed.1999). *See also New Port Largo, Inc. v. Monroe County,* 985 F.2d 1488, 1500 n. 7 (11th Cir.1993) (Edmondson, J., concurring) (suggesting that *dictum* is statement not squarely presented by facts and one not absolutely necessary to decision of concrete case before the court). The Supreme Court has indicated that *dicta* are those statements that constitute neither the result of the case nor the portions of the opinion necessary to such result. *Seminole Tribe of Fla. v. Florida,* 517 U.S. 44, 66-67, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). As Judge Posner has

**22**

indicated, however, what is often at stake in distinguishing *dictum* from the holding of a case is that *dictum* is not authoritative. *Crawley,* 837 F.2d at 292. "So instead of asking what the word 'dictum' means we can ask what reasons there are against a court's giving weight to a passage found in a previous opinion." *Id.*

There are at least two reasons for labeling much of what is said in *Fraser* as *dicta.* First, Chief Justice Burger's statements about the mission of public education is written so broadly as to be considered an aside lacking the authority of binding precedent. The opinion sweepingly states that public education is to inculcate "fundamental values necessary to the maintenance of a democratic political system," *Fraser,* 478 U.S. at 681, 106 S.Ct. 3159, and intimates that such fundamental values may be considered in determining the appropriateness of student speech. *See id.* at 683, 106 S.Ct. 3159. Many, however, would consider patriotism a fundamental value, yet the Court held that arguably unpatriotic speech in *Tinker* was protected by the First Amendment. *Tinker,* 393 U.S. at 514, 89 S.Ct. 733. *Cf. West Virginia Bd. of Educ. v. Barnette,* 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943) (holding that school could not compel students to salute American flag). Some might feel that promoting long-held American virtues such a freedom of religion and due process of law is a fundamental value, yet the predecessor of this circuit, at a time when American citizens were being held hostage, found protected under the First Amendment speech in support of the Ayatollah's Iran, a theocratic state hostile to the United States. *Shamloo,* 620 F.2d at 522. These examples strongly suggest that the Court did not mean to endorse the full ramifications of Chief Justice Burger's sweeping statements about fundamental values.

Second, *Fraser* 's discussion of civility and values is not necessary to the decision in the case. As noted, the student's speech was disruptive and interfered with the maintenance of an orderly educational environment. Therefore, regardless of any discussion about civility and values, the disciplinary action was valid under *Tinker. See Tinker,* 393 U.S. at 513, 89 S.Ct. 733 (stating that student may express opinions "if he does so without 'materially and substantially interfer[ing] with the operation of the school' and without colliding with the rights of others") (quoting *Burnside,* 363 F.2d at 749). Further, as was said in both

**23**

*Burnside* and *Blackwell,* on which the *Tinker* Court relied, a court is not to be concerned with the wisdom or expedience of the school's disciplinary action but whether such action is a reasonable exercise of the school's (that is, the government's) power to regulate. *Blackwell,* 363 F.2d at 754; *Burnside,* 363 F.2d at 748. The language in *Fraser* about civility and values is an exposition on the wisdom of the school's actions. All that was needed to decide the case, however, was a finding that those actions were reasonable because of the disruptive effect of the student's speech.

Not only is Chief Justice Burger's tribute to civility *dicta* in *Fraser,* it is not even the Supreme Court's own understanding of what was decided there. In *Hazelwood Sch. Dist. v. Kuhlmeier,* 484 U.S. 260, 266, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988), it was said that *Fraser* stands for the proposition that a school is entitled to disassociate itself from speech that would demonstrate to others that such vulgarity is "wholly inconsistent with the 'fundamental values' of public education. *Fraser* at 686, 106 S.Ct. 3159." In *Fraser* itself, the Court indicated that the decision stood for the proposition that a school has the authority to refuse to sponsor student speech that might reasonably be perceived as inconsistent with "the shared values of a civilized social order." *Fraser,* 478 U.S. at 683, 106 S.Ct. 3159. For these reasons, *Fraser* does not muddy the clearly established law governing this case, where the student's speech was not disruptive, did not violate an established school rule, and could not be said to bear the imprimatur of the school.

The majority also cites to *Muller by Muller v. Jefferson Lighthouse School,* 98 F.3d 1530 (7th Cir.1996), to support its contention that the law was not clearly established that Denno could not be punished for his symbolic speech. This heavy reliance cannot be justified. First, it is the decision of another circuit and thus of no aid to our appellees if the law of our circuit was clearly established to the contrary. *Cf. Wilson v. Layne,* 526 U.S. 603, 617, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999) (suggesting that parties look first to "controlling authority in their jurisdiction" and then to persuasive authority). *See also Jenkins by Hall v. Talladega City Bd. of Educ.,* 115 F.3d 821, 826 n. 4 (11th Cir.1997) (en banc) (explaining that decisions from only United States Supreme Court, Eleventh Circuit, or highest court of relevant state clearly establish law

for purposes of qualified immunity). Second, it was decided after the incident in question and, therefore, could not deconstruct the established law. *See Lassiter,* 28 F.3d at 1150 (noting that qualified immunity is surrendered only when "pre-existing law" clearly establishes right in question). Third, it deals with speech in a grammar school, not a high school, and the discussion of the need for parent-like custody in *Muller* is therefore not as persuasive. Fourth, the question before the *Muller* court was the reasonableness of a school code dealing with the distribution of publications on campus, not student discipline.[3] The case stands only for the proposition that this regulation was reasonable. It clearly does not stand for the proposition that student rights of free speech have been modified by *Fraser* or *Hazelwood.* Fifth, two of the three judges on the panel concurred only in the result (that the regulation was reasonable) and not with the analysis on the extent of the rights of pupils freely to express their ideas. For all of these reasons, *Muller* has no bearing on a determination of whether the school officials in this case are entitled to qualified immunity.

Finally, the majority makes reference to the district court opinion in *West v. Derby Unified School Dist. No. 260,* 23 F.Supp.2d 1223 (D.Kan.1998). As the majority mentions, this case has now been decided by the Tenth Circuit. 206 F.3d 1358 (10th Cir.2000). In that case (which, like *Muller,* was decided after Denno's suspension), a student was suspended for drawing and passing along a Confederate flag. He was

---

[3]The regulation in question, Section 6144.11, stated in part:

> *Non-school-sponsored publications.* Publications produced by school district students without school sponsorship, or handbills, may be distributed and/or sold within the school according to the following procedure. 1. They must include the name of the sponsoring organization and/or individual. 2. A time and place for the distribution must be set cooperatively with the principal. 3. A copy must be given to the principal at least 24 hours before its distribution. 4. The publication shall contain this phrase: "The opinions expressed are not necessarily those of the school district or its personnel." 5. If the principal finds the publication (1) contains libelous or obscene language, (2) may incite (lead) persons to illegal acts, (3) is insulting to any group or individuals, or (4) he/she can reasonably forecast that its distribution to the students will greatly disrupt or materially interfere with school procedures and intrude into school affairs or the lives of others, the principal shall notify the sponsors of the publication that its distribution may not be started, or must stop. The principal shall state the reason for his/her decisions.

*Muller,* 98 F.3d at 1534.

suspended because his actions violated the "Racial Harassment and Intimidation" policy which had been adopted by the high school after a series of very serious racial incidents occurred. The policy prohibited students from having in their possession any written material that was racially divisive and included by way of example Confederate flags. The Tenth Circuit found the rule to be reasonable in that it was not the product of undifferentiated fear or apprehension, but rather was the product of the school officials' reasonable belief, based on past events, that the student's display of the flag would cause disruption. *Id.* at 1366. *Cf. Tinker,* 393 U.S. at 508, 89 S.Ct. 733.

There is no doubt that a school is always on a firm constitutional footing in adopting regulations that impinge on student speech, where the regulations take into consideration legitimate pedagogical concerns and the atmosphere of the school. *See Bayless v. Martine,* 430 F.2d 873, 878-79 (5th Cir.1970). In our case, the regulation of the speech was *ad hoc,* and the student was disciplined solely because of the content of his speech. Further, so far as our record goes, Denno's actual speech accompanying the display of the battle flag dealt with the historical aspects of the Civil War, one of the most significant and complicated periods in this nation's annals. The Confederate battle flag itself is a catalyst for the discussion of varying viewpoints on history, politics, and societal issues. Discourse on such issues, without the fear of undue government constraint or retaliation, is exactly what the First Amendment was designed to protect. *See Mills v. Alabama,* 384 U.S. 214, 218-19, 86 S.Ct. 1434, 16 L.Ed.2d 484 (1966); *Thornhill v. Alabama,* 310 U.S. 88, 102, 60 S.Ct. 736, 84 L.Ed. 1093 (1940). Repressing this kind of discussion would be as unreasonable, and hopefully unthinkable, as a rule that forbids students to discuss the Constitution of the United States on the basis that it recognized slavery or forbids the display of the American flag because it has been carried by hate groups.

But the reasonableness of school regulations that enact notions of political correctness *au courant* in the name of inculcating students with civility is not the issue for this dissent. It is, instead, whether in 1995 it was clearly established that a student could not be disciplined because of the content of his speech. The law of this circuit clearly answers that the student is at the mercy of the consequences of his speech, and if

**26**

the speech occasions a material disruption of class work or substantial disorder, he may be punished; otherwise, he may not.  Nothing in the court's opinion establishes that this proposition was seriously in doubt in 1995.

Finally, I agree with the majority's ruling as to the liability of the Board and join that portion of the majority opinion *in toto*.